Heather REA, Appellant–Petitioner,

v.

James A. SHROYER, Appellee–
Respondent.

No. 27A02–0306–JV–479.

Court of Appeals of Indiana.

Oct. 31, 2003.

Martin A. Harker, Kiley, Kiley, Harker, Michael & Certain, Marion, IN, Attorney for Appellant.

Donald J. Bolinger II, Donald J. Bolinger Law Firm, Kokomo, IN, Attorney for Appellee.

## OPINION

MAY, Judge.

Heather Rea appeals the trial court's transfer of custody of her daughter, B.R., from Rea to James Shroyer, B.R.'s father. Rea raises two issues, which we consolidate and restate as whether the trial court abused its discretion when it modified custody. We affirm.

## FACTS AND PROCEDURAL HISTORY[1]

On September 2, 1998, Rea gave birth to B.R. out of wedlock. On November 2, 1998, Rea filed a paternity action claiming Shroyer was B.R.'s father. Blood tests demonstrated Shroyer was, in fact, B.R.'s biological father. On August 3, 1999, the court found Shroyer was B.R.'s father, awarded custody of B.R. to Rea, and required Shroyer to pay $154.00 support per week. The order did not establish a specific visitation schedule, but it granted to Shroyer "regular" visitation "at all reasonable and proper times." (Appellant's App. at 17.)

On March 26, 2002, Shroyer filed a petition to modify custody and support, in which he alleged a substantial and continuing change in circumstances justified modifying custody. On January 17, 2003, Shroyer, his counsel, and Rea's counsel appeared for a hearing, after which the

trial court gave Shroyer temporary custody of B.R., gave Rea visitation in accordance with the Parenting Time Guidelines, temporarily terminated Shroyer's payments of child support, and ordered Rea to pay $35.00 per week in child support.

On April 4, 2003, the parties appeared for the modification hearing. After the court heard evidence, it announced its decision:

THE COURT: [...] In listening to the evidence presented and weighing the credibility of the witnesses I think that what happened in November through January was a voluntary exchange of custody. Uh, I think the fact that the child is in school in Kokomo, is going to church in Kokomo, uh, has her own bedroom in Kokomo and has been living at that house ... even if we were to take the petitioner at her word, on her testimony, I think it would be well over fifty per cent of the time. I think closer to sixty or seventy per cent of the time. Uh, I do have some concerns as to the moving that you've done in the past and some of the ... not to say that there's anything wrong with your brother's house, uh, just two bedrooms for that many people being there, uh, is a little concerning. I know you're not there anymore but that's another change in circumstances that I think took place. Uh, for those reasons I am going to order that custody be modified so that the respondent is to have sole physical custody. I am going to order that the parties are to have joint legal custody. What that means is that the parties are

---

1. Appellant's Statement of Facts included numerous facts that were not favorable to the judgment, in violation of Ind. Appellate Rule 46(A)(6)(b).

More astonishing is Appellee's brief, which includes *no* citations to the record, caselaw, statutes, or any other authority in its Statement of Facts or Argument, in violation of Ind.App. R. 46(A)(6)(a) and R. 46(A)(8)(a).

to share equally in the major decision making of the child as it relates to health care, education, religious training, etc.[ ... ] I have to make the very tough decision. I'm not saying that one parent is better than the other, but I just think the circumstances, and looking at the best interest of the child is ... she's better off with the father and the family in Kokomo. I'm not saying that one parent is better than the other. I'm making the decision based upon the evidence presented to me and it's not an easy decision. [ ... ] I'm going to order, uh, and it's also that her visitation is going to be pursuant to the Parenting Time Guidelines from here on out. That sets a minimum amount of visitation. It is my hope that the parties are going to communicate, and I'm going to order that the parties communicate better than they have in the past. I'm going to order that the respondent is to provide the petitioner with schedules of all sporting events, school activities, pre-school activities, any activities at the church, to notify her of that so that she has an opportunity to be there for that. In addition, she is to have telephone visitation, e-mail visitation, if it's available, and try to be flexible with each other. [ ... ] In addition, I am going to order that neither side is to disparage the other party or the other family in front of the child. She doesn't need to be brought into any of those types of disputes. There may be times where the two of you are going to have disagreements as to visitation dates, whatever, and you can have those disagreements but do it civillaly [sic] and don't have her be in the room when it is going on. Uh, if I found [sic] out that you have violated my order as to that you will spend a minimum of one weekend in jail. [ ... ] The court is going to keep the order of support at this time at $35.00 a week. I don't think it's going to go up. Are we willing to stipulate to that? He's shaking his head that he's fine with that.

(Tr. at 143–47.) The court then requested that Shroyer's counsel prepare "proposed Findings and Recommendations." (*Id.* at 147.) On April 22, 2003, the trial court signed Shroyer's proposed order, which provided:

The Court having heard testimony and considered the evidence of the parties rules as follows:

1. The Father's Petition to Modify Custody is granted and the child [B.R.], d/o/b: 09/02/98, is awarded to the Father.

2. The Mother and Father are to have joint legal custody. The sole physical custody is to be with the Father.

3. The Mother is to have visitation according to the Indiana Parenting Time Guidelines. The Respondent/Father shall provide to the Petitioner/Mother schedules of all activities including but not limited to school activities, soccer activities, and church activities.

4. The Respondent is to allow reasonable telephone and e-mail visitation if possible between Mother and the child.

5. Both sides are admonished not to disparage each other or each other's families in front of the child.

6. The Petitioner/Mother is ordered to pay support in the amount of Thirty–Five Dollars and 00/100 ($35.00) per week. The Court noting that this is the minimum support order of the Court.

7. The parties are to attempt to coordinate Mother's weekend visitation so that it corresponds with her weekends of having her other daughter so that the

two girls can be togther [sic] and continue to develop their relationship.

(Appellant's App. at 26–27.)

## DISCUSSION AND DECISION

■■■ Rea claims the trial court abused its discretion when it modified custody. A trial court has discretion to determine whether custody should be modified. *Joe v. Lebow*, 670 N.E.2d 9, 23 (Ind.Ct.App. 1996). When reviewing its determination, we may not reweigh the evidence or judge the credibility of the witnesses. *Sims v. Sims*, 770 N.E.2d 860, 863 (Ind.Ct.App. 2002). Rather, we consider only the evidence most favorable to the judgment and any reasonable inferences from that evidence. *Id.*

■■■ Here, neither party requested findings and conclusions, as permitted by Trial Rule 52. However, the trial court gratuitously entered some findings of fact and conclusions of law at the end of the custody hearing. (*See* Tr. at 143–47.) The trial court's findings control only the issues they cover, and we will apply a general judgment standard to any issue about which the court made no findings. *Sutton v. Sutton*, 773 N.E.2d 289, 293 (Ind.Ct. App.2002). A general judgment may be affirmed based on any legal theory supported by the evidence. *Id.* As we conduct our review, we presume the trial court followed the law. *Sims*, 770 N.E.2d at 864. Moreover, "it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Kirk*

*v. Kirk*, 770 N.E.2d 304, 307 (Ind.2002) (quoting *Brickley v. Brickley*, 247 Ind. 201, 210 N.E.2d 850 (1965)).

Specifically, Rea claims the trial court abused its discretion because it failed to follow the controlling statute.[2] Modifications of custody subsequent to a paternity determination are to be made according to Ind.Code § 31–14–13–6, which provides:

The court may not modify a child custody order unless:

(1) modification is in the best interests of the child; and

(2) there is a substantial change in one (1) or more of the factors that the court may consider under section 2 and, if applicable, section 2.5 of this chapter.

Section 2 of that chapter provides:

The court shall determine custody in accordance with the best interests of the child. In determining the child's best interests, there is not a presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parents;

(B) the child's siblings; and

---

**2.** Rea argues: "[Shroyer] should not be allowed to relitigate the initial custody determination." (Br. of Appellant at 23.) We agree. We have previously held that if a father acquiesced for years in a mother having custody of a child born out of wedlock, without the court entering an initial custody determination, his request for custody after those years was nevertheless a modification of custody, not an initial custody determination. *In re Paternity of Winkler*, 725 N.E.2d 124, 128 (Ind.Ct.App.2000). Accordingly, for the court to modify custody herein, where Shroyer did not initially challenge Rea's custody of B.R., Shroyer had to meet the standard in Ind.Code § 31–14–13–6. *See id.*

(C) any other person who may significantly affect the child's best interest.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

Ind.Code § 31–14–13–2.

Rea asserts the evidence at trial did not demonstrate a substantial change in one of the factors listed in Section 2.[3] Before we may address that argument, however, we need to determine what evidence may properly be considered when deciding whether a substantial change occurred. Rea cites *Joe*, 670 N.E.2d at 22–23, and asserts the trial court improperly considered events that occurred after Shroyer filed his petition to modify custody in March of 2002.

In *Joe*, we held that when making a determination regarding modification of custody, evidence of events occurring after the court granted an emergency petition to modify support may be considered *only* when determining what is in the best interests of the child. *See Joe*, 670 N.E.2d at 22–23. As for a substantial change in one of the factors in Ind.Code § 31–14–13–6, the evidence must demonstrate "changes occurring ... while in Mother's custody prior to the emergency petition which justified the transfer of custody." *Id.* at 23. Consequently, *Joe* does not support Rea's argument that the trial court may not consider evidence of events occurring after Shroyer filed his petition to modify custody in March of 2002.

■ Moreover, contrary to Rea's argument, we have previously held when determining whether a change in circumstances has occurred that the trial court may consider changes that have occurred since the last custody determination. *Mundon v. Mundon*, 703 N.E.2d 1130, 1133–34 (Ind. Ct.App.1999). On more than one occasion, we have cited evidence occurring at the time of the hearing, which is necessarily after the petition was filed, that supports the trial court's decision to grant or deny a petition to modify custody. *See, e.g., Harris v. Smith*, 752 N.E.2d 1283, 1290–91 (Ind.Ct.App.2001), *reh'g denied; Wallin v. Wallin*, 668 N.E.2d 259, 261–62 (Ind.Ct. App.1996). Accordingly, when determin-

---

**3.** Rea also argues the trial court failed to find the existing custody arrangement was "unreasonable." (Br. of Appellant at 26.) However, "a trial court need no longer find that an existing custody order is unreasonable in order to modify custody, so long as a 'substantial change' in one of the enumerated factors has occurred, and the trial court finds as well that modification would be in the child's best interests." *Joe*, 670 N.E.2d at 21. *See also Wallin v. Wallin*, 668 N.E.2d 259, 261–62 (Ind.Ct.App.1996) (Ind.Code § "31–1–11.5–22(d) no longer requires a finding that the current custody arrangement is unreasonable before allowing a modification").

Rea cites three Court of Appeals cases more recent than *Joe* that state an existing custody order must be "unreasonable" before custody can be modified. (*See* Br. of Appellant at 25–26) (citing *Cunningham v. Cunningham*, 787 N.E.2d 930 (Ind.Ct.App.2003); *Haley v. Haley*, 771 N.E.2d 743 (Ind.Ct.App.2002); *In re Paternity of Winkler*, 725 N.E.2d 124 (Ind.Ct. App.2000)). However, our review of those cases reveals that while each stated in the standard of review section that an existing custody order had to be unreasonable to be modified, the analysis and decision in each case was based on whether a substantial change occurred in one of the factors and whether modification was in the best interests of the child. Accordingly, we follow the well-reasoned holding in *Joe* and do not address whether the existing custody arrangement was unreasonable.

ing whether a substantial change occurred in one of the statutory factors, we consider any events that occurred between August 3, 1999, when the court originally gave Rea custody of B.R., and January 17, 2003, when the court gave temporary custody of B.R. to Shroyer.

In its statement at the end of the hearing, the trial court cited two changes—a "voluntary exchange of custody" and Rea's living arrangements. As for the "exchange of custody," the trial court said:

> In listening to the evidence presented and weighing the credibility of the witnesses I think that what happened in November through January was a voluntary exchange of custody. Uh, I think the fact that the child is in school in Kokomo, is going to church in Kokomo, uh, has her own bedroom in Kokomo and has been living at that house [ ... ] sixty or seventy per cent of the time.

(Tr. at 144.) As to Rea's living arrangements, the court said:

> Uh, I do have some concerns as to the moving that you've done in the past and some of the ... not to say that there's anything wrong with your brother's house, uh, just two bedrooms for that many people being there, uh, is a little concerning. I know you're not there anymore but that's another change in circumstances that I think took place.

(*Id.*)

The following evidence supports the trial court's finding that a voluntary exchange of custody had occurred. Shroyer submitted a calendar he and his wife kept to document the number of days B.R. stayed at his house overnight. The calendar indicates B.R. stayed with Rea only seventy-six nights in 2002.[4] The other 289 days in 2002, B.R. stayed with Shroyer. Shroyer's wife testified that B.R. stayed with them extended periods of time in November and December of 2001, but they had not kept a calendar for those months. While staying with the Shroyers during 2002, B.R. began attending church, participating in Sunday School and children's programs at church, and attending preschool.

Regarding Rea's living arrangements, the evidence indicates the following. From November of 2001 to October of 2002, Rea and her two daughters lived in a three-bedroom house[5] with her brother and his girlfriend. Her brother's children also stayed at the house some weekends. During that time, Rea's brother was on home detention, but Rea had no knowledge of the type of crime her brother had committed and did not think it was important. From October 2002 to January 2003, Rea and her two girls lived in a two-bedroom apartment with a friend, who also had two daughters staying with her. In January of 2003, Rea and the girls moved to a new apartment with help from Greg Bancroft, whose arrest record Rea testified she had no knowledge of because she did not care if he had been arrested.[6] This evidence supports the trial court's finding that Rea's living arrangements had been "a little concerning." (*Id.*)

---

4. Specifically, during 2002, B.R. stayed with Rea two nights in January, three nights in February, six nights in March, five nights in April, four nights in May, three nights in June, twelve nights in July, twelve nights in August, eight nights in September, three nights in October, nine nights in November, and nine nights in December.

5. Rea testified one of those three bedrooms was filled with boxes and was used only for storage.

6. We found no testimony in the record to indicate Bancroft had, in fact, ever been arrested.

Both of those changes impact the fourth and fifth factors listed in Ind.Code § 31–14–13–2: "(4) The interaction and interrelationship of the child with: (A) the child's parents; (B) the child's siblings; and (C) any other person who may significantly affect the child's best interest" and "(5) The child's adjustment to home, school, and community." Our standard of review prohibits us from reweighing the evidence, reassessing the credibility of the witnesses, or second-guessing the decision made by the trial court. The record supports the trial court's conclusion that changes had occurred in some of the factors listed in Ind.Code § 31–14–13–2.

Nevertheless, Rea claims public policy should have prohibited the trial court from modifying custody because the Parenting Time Guidelines encourage the custodial parent to allow the non-custodial parent to have additional time with the child. She claims that by allowing the trial court to modify custody in this case "custodial parents across the state would no longer grant any extended or extraordinary visitation other than the court has expressly ordered, for fear that such visitation will lead to a loss of custody." (Br. of Appellant at 20.)

We disagree with the conclusion Rea believes others should draw from the result herein. This is not a situation where a non-custodial parent was allowed an extra month of visitation in the summer or a few extra days or weekends during the year. In the fourteen months before the court gave Shroyer temporary custody, B.R. lived with Shroyer over seventy percent of the time, even though Rea technically had physical custody of her.

We still firmly believe "[c]ontinuity and stability in the life of a child is an important component in determining the proper custodial arrangement for a child." *In re M.J.M.*, 766 N.E.2d 1203, 1210 (Ind. Ct.App.2002). In this case, however, continuity and stability weigh in favor of keeping B.R. with Shroyer. Because there is evidence in the record to support the trial court's decision, we cannot say the trial court abused its discretion when it modified custody.

Affirmed.

DARDEN, J., and BARNES, J., concur.